Filed 1/7/14  Welch v. Koch CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JEANNE M. WELCH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHARLES STEPHEN KOCH,<br><br>    Defendant and Respondent. | H037228<br>(Santa Clara County<br>Super. Ct. No. CV166399) |

Plaintiff Jeanne M. Welch brought a personal injury action against defendant Charles Stephen Koch.  Following a jury trial, plaintiff was awarded damages in the amount of $76,224.99.  On appeal, plaintiff contends:  (1) the trial court abused its discretion in excluding plaintiff's expert's opinion testimony regarding future knee surgery, and (2) the trial court erred in failing to declare a mistrial when the defense expert testified regarding future medical treatment.  We find no error requiring reversal and affirm the judgment.

## I.  Statement of the Case

Plaintiff brought a negligence action against defendant.  Defendant conceded that he was responsible for striking plaintiff with his vehicle.  The sole issue at trial was the nature and extent of damages.  Following trial, the jury rendered a verdict in favor of

plaintiff in the amount of $104,903.09.  The jury awarded plaintiff:  $13,500 for lost earnings, $46,403.09 for medical expenses, $40,000 for past noneconomic loss, including physical and mental suffering, and $5,000 for future noneconomic loss, including physical pain and suffering.  Plaintiff brought a motion for new trial in which plaintiff argued:  damages were inadequate, and the trial court erred in excluding expert opinion testimony regarding future knee surgery.  The trial court denied the motion.  Following a motion by defendant, the trial court reduced the damages award by $28,678.10 to reflect the amount of medical expenses that plaintiff actually paid.  Plaintiff filed a timely notice of appeal.

## II. Statement of Facts

In December 2009, plaintiff, who was then 61 years old, worked as a mortgage broker and a real estate broker.  She had previously worked as a ski instructor from 1994 until 1998, and skiing had continued to be an important part of her life.  Prior to the accident, she walked five to seven miles almost every day, played golf once or twice a week, and enjoyed bike riding.

At approximately 6:30 p.m. on December 4, 2009, defendant made a left turn from East Main Street onto Jackson Street in Los Gatos.  Defendant's vehicle hit plaintiff's leg as she was walking in the crosswalk.  Plaintiff was thrown onto the hood of defendant's vehicle and then to the ground.

Due to her injuries, plaintiff was transported to Good Samaritan Hospital.  X-rays revealed that she had sustained comminuted fractures to the tibia and fibula of her left leg.  At plaintiff's request, she was transferred to O'Connor Hospital where she was treated by Dr. Stephen Tasker Imrie, an orthopedic surgeon.  Plaintiff had known Dr. Imrie for about 25 years.  Following discussion of treatment options with plaintiff, Dr. Imrie decided to cast her leg rather than perform surgery.  Three days after the accident, plaintiff was discharged from the hospital.  About a month later, Dr. Imrie

2

removed the cast, and shortly thereafter plaintiff was fitted with a brace. At that time, she was experiencing moderate pain. Plaintiff then received physical therapy until the end of March 2010.

In June 2010, Dr. Imrie noted that plaintiff was complaining of more severe pain. X-rays showed that her leg was continuing to heal. Dr. Imrie's notes from a December 2010 office visit state: "Overall she's about 50 percent better than she was at her worst, but has not improved in the past month. She has moderate pain when she bears weight, when she kneels or squats, if she twists her knee, or when the weather changes. She's able to walk two or three miles without external support. She doesn't feel that she would be able to ski comfortably." Plaintiff was also "frustrated by her limited activity, particularly her ability to ski."

At the December 2010 office visit, Dr. Imrie found no problems with the strength of the knee muscles and no significant problems with her ligaments. Dr. Imrie opined that plaintiff had "reached her maximum benefit in terms of healing," and he did not have plans for surgery or any other care. Plaintiff did not return to see Dr. Imrie for any office visits.

At the time of trial in May 2011, plaintiff was walking three miles a day at least three times a week. Though she experienced pain as a result of these walks, she continued to walk because she believed that it was beneficial for her health. In January 2011, she had gone skiing, but could not make turns on her left leg until wedges were put in her boots. She was unable to ride a bike or play golf.

Dr. Paul Mills, an orthopedic surgeon, testified as an expert in orthopedics for the defense. Dr. Mills examined plaintiff in November 2010. Plaintiff demonstrated a normal gait. She reported that she could walk a couple of miles before developing a sharp pain on the inner side of her left knee and that she had some problems when she rotated her left ankle. Dr. Mills found that her sensation was intact and equal on both

3

sides and there was no neurological abnormality. The strength in plaintiff's quadriceps and other muscles around the knee and ankle were normal and equal on both extremities.

Dr. Mills concluded that there were no significant abnormalities in the range of motion for plaintiff's hips, knees, and ankles. There was no swelling of either knee joint and her knee ligaments functioned normally. His examination revealed that the valgus for both knees was approximately 10 degrees, which was normal. In reviewing the April 2011 X-ray, Dr. Mills noted that plaintiff's left knee measured 12 degrees while her right knee measured 10 degrees. According to Dr. Mills, the two degree difference was not significant. Based on the April 2011 X-ray, Dr. Mills testified that the joint space in her left knee was essentially the same size and there was "no collapse or narrowing down of one side of the knee compared to the other," thus indicating that there "ha[dn't] been any asymmetric narrowing or wearing away of the cartilage that one might attribute to a specific event like a fracture."

### III.    Discussion
### A. Admissibility of Evidence

Plaintiff contends that the trial court abused its discretion in granting defendant's motion in limine to exclude expert opinion testimony regarding future knee surgery.

### 1.  Background
### a.  Deposition Testimony

In March 2011, defendant deposed Dr. Imrie. Dr. Imrie testified that he and plaintiff had been friends through their children since the early 1980's. He testified that he would order additional X-rays if plaintiff "wants to have surgery. At some point she's likely to be a candidate, she may be a candidate for total knee arthroplasty." The following exchange then occurred. "Q. I see. Good. At this point in time, it's not medically probable she'll need a knee replacement? [¶] A. I can say at this point in time she's not -- doesn't believe she's a candidate for total knee replacement. And I don't

4

believe currently she is. That's not to say in the future she may not be. So I want to stay away from that term, 'medically probable,' right now. [¶] Q. Every doctor wants to stay away from that term and every lawyer wants that term. [¶] In any event, there's no plan for any future surgery for her at this time? [¶] A. I have no plans at present to do that." Dr. Imrie was questioned again about future surgery: "Q. So there's no arthroscopic surgery that you're contemplating at this time with respect to her? [¶] A. I'm not planning any surgery on her at this point. That would be an option, if at some time she was having symptoms I thought I could deal with arthroscopically."

### b. Motions In Limine

Defendant brought various motions in limine, including a motion to exclude any references to medical "possibilities." Defendant attached portions of the testimony of Drs. Imrie and Ronald Joseph to his motion.[1] Plaintiff filed opposition to this motion and asserted that she would only introduce evidence as to the probability of future medical care. Plaintiff also disputed defendant's interpretation of Dr. Imrie's deposition testimony.

Following argument by counsel regarding their interpretations of Dr. Imrie's deposition testimony, the trial court expressed its concerns: "The issue is even whether it

---

[1]    Plaintiff saw Dr. Joseph, an orthopedic surgeon, for a second opinion regarding the care she was receiving from Dr. Imrie. Dr. Joseph saw plaintiff in December 2009 and July 2010. When Dr. Joseph was deposed in March 2011, defense counsel asked whether he had an opinion as to whether it was medically probable that plaintiff would need knee replacement surgery. Dr. Joseph responded: "I could not say probable, on a 51 percent basis, but the possibility is certainly there because of the fact that she had comminution, she had some settling of the . . . lateral side." Plaintiff's counsel asked: "Now, if we take the accident, she's 61 years old, 2009, and whatever somebody's life expectancy is at that age, within her lifetime, do you believe that she's going to have to have a total knee replacement to correct what happened to her in the accident?" Dr. Joseph responded: "I would have to say that it's possible. I can't say probable." He explained that he would "like to see newer films" and he "would look for narrowing of the joint . . . ."

5

goes in front of the jury. I don't want them to hear all of this testimony and then it ends up that it's not probable, because it just wasted their time. And it is, I think, prejudicial. [¶] So you say, Mr. Kemp, you don't know what your doctor is going to say. I almost think we need to have a mini hearing before the trial so that I can determine what the doctor is going to say. If he can't say that it's probable, then this issue doesn't even get raised with him. Because I want a preliminary showing that his testimony is even relevant to that issue. I don't want an issue raised before the jury that's not going to be put before them." The trial court deferred ruling on the motion.

### c. Evidence Code Section 402 Hearing

The trial court conducted a hearing pursuant to Evidence Code section 402. Dr. Imrie testified: "In the future, I think it's likely that she will want further treatment, perhaps including a total knee replacement" and, "[i]f her symptoms are severe enough, then I think she would be a candidate for a total knee replacement." Dr. Imrie found no damage to the nerve near plaintiff's fibula. Plaintiff's X-rays were "normal except for the fracture." When plaintiff's counsel asked Dr. Imrie whether he had "given [plaintiff] an option in the future of having a total knee [replacement]," he replied, "I've told her that that's a possibility in the future." The following exchange then occurred: "Q. Okay. [¶] And one of the questions -- and it came about in your deposition, Dr. Imrie, is when we're dealing in a courtroom, we have to deal with probabilities, not possibilities. And so my question to you is, looking back at her condition back in December of '09, which you indicated you believe is -- she was basically symptom free; is that right? [¶] A. That's correct. [¶] Q. Had a normal left leg? [¶] A. Correct. [¶] Q. Okay. [¶] And now we know, 15 months later, you understand she's still having problems? [¶] A. That's correct. [¶] Q. And she's probably not going to get better? [¶] A. That's correct. [¶] Q. So the question is, the medical treatment available for her, other than living the rest of her life in pain, is a total knee replacement, something that is probable in her lifetime as a result of this accident of December the 4th of 2009? [¶] A. I think it's

6

more likely than not that at some time in her life she will decide she should have her knee replaced." Dr. Imrie understood that a total knee replacement "would occur when her symptoms developed to the point when she found her activities limited enough that she wanted to undergo that surgery."

On cross-examination, defense counsel questioned Dr. Imrie regarding his deposition testimony. The following exchange occurred: "Q. Doctor, I have a few questions. [¶] First of all, when . . . you were asked in the deposition, 'Is she medically probable to need a knee replacement,' you said that she's not; is that true? [¶] A. You did not ask the question: Will she ever be -- probably be a candidate for a total knee replacement? [¶] You asked the question: Is she now a candidate and you asked me: Do you have plans to do the knee replacement? The answer to which of each of those is no. However, in the future, I think it more likely than not that she will be a candidate."

The cross-examination continued: "Q. So a few minutes ago, you indicated that -- in a question that Mr. Kemp asked you about whether or not it's medically probable that she will need knee replacement in the future, you said that it's more likely than not that she will decide to do that in the future. [¶] A. That's correct. [¶] Q. So it's not something that you think is medically probable from a doctor's perspective; you're leaving it up to the patient to decide whether or not she can do this kind of activity and require a knee replacement. [¶] A. She will make that decision when her symptoms warrant, and at the point it will be medically indicated. And I believe it's more likely than not that at that point, at some point in the future, she will make that decision. [¶] . . . [¶] A. I'm saying in the future I expect for her symptoms to get worse, and I expect to agree with her at some time in the future that a total knee replacement would be appropriate. [¶] . . . [¶] Q. . . . Well, that kind of gets to that point. It's possible that she'll need a knee replacement in the future, but it's not probable, is it? [¶] A. In my opinion, it is probable."

According to Dr. Imrie, none of the X-rays that were taken between December 4, 2009 and April 11, 2011, showed degenerative changes in the left knee. Dr. Imrie noted that the X-ray in April 2011 showed adequate joint space on her left side. He further testified that, "if [plaintiff] maintains good joint space and there's no indication of arthritic changes, then she wouldn't be a candidate for a total knee replacement." Dr. Imrie stated that the X-rays also showed slight valgus, that is, "a little bit more knock-knee than normal." This finding, however, did not change his opinion. He would not expect to observe degenerative changes due to the accident a year and a half after the accident, but he would expect such changes after "[s]everal years. Five years, ten years. I don't know how many years, but it is a process that occurs over many years." In his view, plaintiff "might not know for five to ten years if she is going to have degenerative changes in . . . that knee." After defense counsel asked, "And so that's why it's not possible for you to say that it's medically probable that she'll have it because it's still something that may or may not occur in the future." Dr. Imrie responded, "As I've said, I think it's probable that her changes will develop. I know of no data to support that clearly. But in my opinion, it is probable that these changes will develop over the next five, ten, fifteen years."

The trial court also questioned Dr. Imrie. "THE COURT: All right. [¶] I'm not sure. If there is no data to support that there is a probability that change will happen in the future, then what do you base your opinion on that it's probable in the future she would need this surgery? [¶] THE WITNESS: The problem, your honor, is there are no comparison studies. In medicine, we look at evidence-based medicine, and to have an experiment where we follow patients over years of the statistical significance, we don't have that data published. [¶] All orthopedic surgeons believe that injuries to joints lead to degenerative change and so it's based on common opinion, not on hard data. [¶] THE COURT: I still don't know . . . what you base your opinion on that it's probable that she may need surgery in the future. [¶] THE WITNESS: As I said, it's based on the belief

8

throughout the orthopedic community; not just my opinion, but all orthopedists, to my knowledge, believe that an injury to a joint is more likely than not to lead to a degenerative change. [¶] THE COURT: But we won't know that for five to ten years. [¶] THE WITNESS: Correct. [¶] THE COURT: So in five to ten years, we might not see any change. [¶] THE WITNESS: We might not. But I think it's more likely than not that we will see changes and that she will develop symptoms at some point."

Plaintiff's counsel argued that Dr. Imrie's testimony satisfied the requirement that it was probable that plaintiff would require knee replacement surgery. He also acknowledged that Dr. Mills, the defense expert, and Dr. Joseph disagreed with Dr. Imrie's opinion and that defense counsel could impeach Dr. Imrie with his deposition testimony. Defense counsel argued that "the definition of possibility has been changed to probability. Because when I asked him in deposition if she's a candidate for total knee replacement, now he's trying to parse words and say not at this time but it's probable in the future but he can't really nail down anything that's going on with respect to [plaintiff] that would trigger that probability. [¶] . . . [¶] I did follow up with a question that said there are no plans for future surgery with respect to her and he said, 'I don't have any plans at this time.' And then he lets her go and says, come back on an as-needed basis. There are no plans. It's a possibility."

### d. The Trial Court's Ruling

The trial court granted the motion in limine to exclude evidence of future knee replacement surgery. The trial court reasoned: "So you will note from the in limine motion that my first impression of reading the deposition testimony was that in the doctor's deposition, it seemed that he said that there was no probability, and that's why we had this hearing; right? [¶] And because, Mr. Kemp, you said that it wasn't very clear in the deposition testimony. [¶] What I am most struck by today is that the doctor says there is no data to support his opinion that the operation might be more likely than not and he says he won't know for five to ten years. So I think while he says 'more likely

9

than not,' I think Mr. Pinelli is correct:  that's more of a possibility than a probability.  [¶] There is no spacing issue; there's no degenerative changes. . . .  [¶]  I find that there is no probability.  There may be a possibility of future knee replacement surgery, but I haven't been shown anything that there is a probability."

## 2.  Legal Analysis

A plaintiff in a personal injury action must prove damages "within a reasonable medical probability based upon competent expert testimony."  (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)  However, "even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise.  [Citation.] . . .  [W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.'  [Citation.]"  (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)

The trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Generally, a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion.  [Citation.]  Accordingly, an in limine ruling to keep particular items of evidence from the jury is subject to reversal only where the trial court exceeded the bounds of reason.  [Citation.]  In other words, the appellate court will not disturb the trial court's decision unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.  [Citation.]  Moreover, when two or more inferences can reasonably be deduced from the facts, the appellate court cannot substitute its decision for that of the trial court.  [Citation.]"  (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1481.)

10

Here, Dr. Imrie initially testified that it was "possible" that plaintiff would require knee replacement surgery, and later testified that it was probable and more likely than not that such surgery would be required. According to Dr. Imrie, if plaintiff maintained adequate joint space and there was no other indication of arthritic changes, she would not be a candidate for knee replacement surgery. He then conceded that none of the X-rays taken after the accident, including the most recent X-ray taken on April 11, 2011, showed degenerative changes in her left knee. Dr. Imrie had no future appointments scheduled for plaintiff and he confirmed that plaintiff did not have "any significant ligament problem." He explained that he would not expect to see degenerative changes for many years, but he had no data to support this opinion. Instead, his opinion was based on "the belief throughout the orthopedic community . . . [that] all orthopedists, to [his] knowledge, believe that an injury to a joint is more likely than not to lead to a degenerative change." Thus, since plaintiff's proffered evidence lacked an adequate foundation, the trial court did not abuse its discretion in excluding Dr. Imrie's opinion testimony regarding future knee surgery.[2]

Moreover, even assuming that the trial court abused its discretion in excluding Dr. Imrie's testimony regarding future knee surgery, plaintiff has failed to show prejudice. A trial court's erroneous ruling on the admissibility of evidence " 'is grounds for reversing a judgment only if the party appealing demonstrates a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.' [Citations.]" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) Had plaintiff presented Dr. Imrie's testimony, defendant would have presented expert testimony from two other orthopedic physicians, Dr. Joseph

---

[2]     Since we conclude that the trial court properly excluded Dr. Imrie's testimony about future knee surgery, we need not consider plaintiff's contention regarding future medical treatment and future wage loss.

and Dr. Mills.[3] They would have contradicted Dr. Imrie's testimony that it was reasonably probable that plaintiff would require knee replacement surgery and his "belief" that "all orthopedists . . . believe that an injury to a joint is more likely than not to lead to a degenerative change," which was the basis for his opinion. In addition, Dr. Imrie would have been impeached with his equivocal testimony at both his deposition and the Evidence Code section 402 hearing on the need for future surgery. The jury would also have been informed that he had been plaintiff's friend for many years. Under these circumstances, there has been no miscarriage of justice.

Plaintiff also challenges the trial court's ruling on other grounds. She contends that the trial court committed reversible error by "usurp[ing] the jury's right [*sic*] to determine whether plaintiff would need future knee surgery." She claims that the trial court's ruling to exclude Dr. Imrie's testimony was based on credibility, which was an issue for the jury to resolve. The record does not support her claim. When plaintiff's counsel suggested that the trial court may not have found Dr. Imrie credible, the trial court responded: "It wasn't credibility. It was basically what he couldn't say, that it was probable. Well, even though he used that word, there was nothing of substance to show that it was probable. [¶] . . . [¶] And you have to state a basis of your opinion. You can't just state something without any meaning behind it."

Plaintiff argues that the trial court erroneously excluded Dr. Imrie's opinion testimony because it failed to meet the standards for the evaluation of a new technique as

---

[3] Plaintiff asserts that it is "sheer[ ] speculation" that defendant would have called Dr. Joseph to testify at trial. Given Dr. Joseph's deposition testimony, it is unclear why plaintiff would not have expected Dr. Joseph to be called by the defense if Dr. Imrie's opinion testimony had been ruled admissible. Plaintiff also claims that Dr. Joseph testified that "he could not say that she needed knee replacement surgery without seeing more recent x-rays." Dr. Joseph testified that it was possible, but not probable, that plaintiff would need knee surgery. He explained that he would "like to see newer films" and he "would look for narrowing of the joint." As Dr. Imrie noted, the most recent X-ray in April 2011 showed adequate joint space.

12

set forth in *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. There is no merit to this argument. The trial court excluded the evidence because it lacked foundation.

Noting that the "motion was to exclude medical 'possibilities' and to permit only medical 'probabilities,'" plaintiff contends that "[t]his is simply the law of evidence and is not the proper subject of a motion in limine." Plaintiff is incorrect. "Evidence Code section 801 requires that any opinion of an expert be based upon matter that is of the type that reasonably may be relied upon. This inquiry by the trial court can be held in an *in camera* hearing. . . ." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 339.) Here, the trial court properly held an in camera hearing to determine whether Dr. Imrie's opinion had an adequate foundation.


### B. Motion for Mistrial

Plaintiff contends that the trial court erred by failing to declare a mistrial "when defense doctor, and defense counsel, testified that no future medical treatment would be necessary" for plaintiff, thereby violating the order in limine.

Here, the following exchange occurred between defense counsel and Dr. Mills: "Q. And is there anything else that indicates to you with respect to any kind of potential arthritis? [¶] A. Well, knowing [plaintiff's] age and seeing that amount of cartilage remaining, it would indicate that she's got a reasonable amount of cartilage to the point that she's probably not going to need any future intervention along the lines of what we orthopedists tend to do to people when their [knee] joint wears out. Her knee is unlikely to wear out. [¶] Q. So it's not probable that she would need knee replacement surgery -- if that's what you mean when you say no intervention with respect to the knee wearing out?" Before Dr. Mills answered the question, plaintiff's counsel asked to approach the bench and a bench conference was held. The trial court then stated: "The objection is

13

sustained. The issue of knee replacement is irrelevant to this case. And it is stricken. The jury is to disregard any of that testimony."

First, a trial court has no duty to act sua sponte to order a mistrial. (*Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 941-942.) Second, to the extent that defense counsel's questions or Dr. Mill's responses suggested that future knee surgery for plaintiff would not be necessary, plaintiff's counsel did not request a mistrial. Instead, plaintiff's counsel promptly objected. The trial court then properly sustained the objection since the order barred "expert witnesses . . . from making any reference to the 'possibility' of surgery or its related cost." " 'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.]" (*Horn v. Atchison, T. & S.F.R. Co.* (1964) 61 Cal.2d 602, 610.) Here, the reference to knee replacement surgery was brief, and Dr. Mills did not render his opinion. Thus, the misconduct was not aggravated. Under these circumstances, "we presume that the jury followed the instructions" since there is nothing in the record to show that they did not do so. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1123.) Accordingly, we reject plaintiff's contention.

## IV. Disposition

The judgment is affirmed.

14

_____

Mihara, J.

WE CONCUR:

_____

Premo, Acting P. J.

_____

Grover, J.

15